# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHANTA PIZARRO,** | : | **Civil No. 3:20-CV-00511** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **JOHN E. WETZEL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The plaintiff, Shanta Pizarro, filed this lawsuit against the defendants, asserting violations of her civil rights pursuant to 42 U.S.C. § 1983. In her complaint, Pizarro alleges that her Fourth and Fourteenth Amendment rights were violated during a visit to the State Correctional Institute ("SCI") in Dallas, Pennsylvania, where her body was "strip" searched and her personal cell phone was searched by correctional staff. Several defendants have been dismissed due to failure to state a claim against them. (Doc. 37). The remaining defendants, Gardzalla, Bradley, and Reese, now move for summary judgment, arguing there is no genuine issue of material fact with respect to these claims.

For the following reasons, the motion for summary judgment will be granted in part and denied in part.

1

## II.   <u>Statement of Facts and of the Case</u>

This case involved the strip search of a prison visitor and the question of whether that highly intrusive physical search was based upon a reasonable suspicion or some unarticulated hunch.

On March 26, 2018, Pizarro arrived at SCI-Dallas for her weekly visit with her boyfriend, Edward Woods, who was incarcerated there. (Doc. 17, ¶¶ 11-12). Such visits take place in a designated visitation room within the prison, and visitors pass through several different security measures before entering. (Doc. 44-4, at 7). Pizarro passed through the usual entry protocols of an ion scan, a metal detector, and a dress code check. (Doc. 17, ¶ 15; Doc. 44-4, at 10). After she did so, Defendants Gardzalla and Bradley approached Pizarro, as they thought she may be smuggling drugs into the prison, told her to accompany them to the Administrative Building next door, and they subsequently escorted her there. (Doc. 17, ¶ 17; Doc. 45, at 23).

Behind a closed door, the two defendants asked Pizarro whether she had ever brought synthetic marijuana or Suboxone into the prison. (Doc. 17, ¶¶ 18, 26). They also asked whether Pizarro had received money from Woods. (<u>Id.</u>, ¶ 30). Although Pizarro admitted to receiving money, she denied any criminal activity and explained that she believed the money came from Woods' poker winnings. (<u>Id.</u>, ¶¶ 27, 31-32). In his deposition, Defendant Bradley stated that at this point in the interaction with Pizarro, he was "on the fence" and "wasn't sure" if Pizarro was in possession of

narcotics. (Doc. 44-2, at 6). Notwithstanding this admitted uncertainty, Defendant Reese was called to conduct a strip search of Pizarro. (Id., at 8).

On this score, it is unclear who actually ordered the strip search. For his part, Bradley stated that he did not have the authority to order a strip search. (Doc. 44-2, at 8). On the other hand, Gardzalla stated that Bradley was the one who requested that Pizarro be searched, and that Gardzalla was acting on Bradley's request when he called for a female officer to assist with a search. (Doc. 45, at 24). Reese stated that she was told by another Lieutenant to meet Gardzalla, and she was only informed that it was a strip search of a visitor when she reported to Gardzalla and Bradley. (Doc. 44-3, at 5). Notably, Reese stated that in her nine years as a correctional officer, Ms. Pizarro was the only visitor she ever strip searched, and that she was aware strip searches of visitors were prohibited by prison policy. (Id., at 6-7).[1]

Despite having the knowledge that the strip search would violate prison policy, Defendant Reese followed the order she was given and escorted Pizarro to a female locker room, where she advised Pizarro that she would be strip searched, although it is unclear if Pizarro actually consented to the search. (Doc. 17, ¶¶ 36, 39; Doc. 44-2, at 8). During the search, Pizarro removed all her clothes, and Defendant

---

[1] Pennsylvania Department of Corrections policy strictly prohibits strip searches of visitors. (See Doc. 45, at 80; see also DC-ADM 812, Section 3B1(b)(6) (updated Feb. 20, 2020).

Reese subjected her to a visual body cavity search that included examinations of Pizarro's mouth, breast, and genital areas. (Doc. 17, ¶ 41; Doc. 44-3, at 5-6; Doc. 44-4, at 13). Following the search, Pizarro was permitted to use the bathroom under observation, dress herself, and return to the room where she was originally questioned. (Doc. 17, ¶¶ 43-44). She was then questioned further regarding the same topics introduced before the search, to which she gave the same responses. (Id., ¶ 44). Pizarro claims that she did not believe she had the right to leave at any point during the aforementioned search or questioning. (Doc. 17, ¶ 21).

After their questioning, Defendants Gardzalla and Bradley escorted Pizarro to her vehicle. (Id., ¶ 48). They then searched the vehicle and Pizarro's cell phone, taking pictures of various screens. (Id., ¶¶ 48, 50). The searches did not result in any findings of contraband. (Id., ¶ 60). The defendants ultimately denied Pizarro's request to visit Woods. (Id., ¶ 62).

It is against this factual backdrop that the plaintiff brought suit pursuant to 42 U.S.C. § 1983 against six named defendants, alleging a deprivation of her Fourth and Fourteenth Amendment rights. (Doc. 17). Three of these defendants have since been dismissed. (Doc. 37). The three remaining defendants—Gardzalla, Bradley, and Reese—have filed the instant motion for summary judgment. (Doc. 42). In doing so, they argue that the plaintiff does not have a valid Fourteenth Amendment due process claim in this case since her claims, which relate to a search and seizure and

are grounded in the Fourth Amendment, are governed under the more-specific provision rule; that the search of the plaintiff's phone was reasonable under the special needs doctrine; that the strip search was supported by reasonable suspicion; and that all three defendants are entitled to both sovereign and qualified immunity. (Doc. 43). For the following reasons, we will recommend that the motion be granted in part and denied in part.

## III.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, 702 F. Supp. 2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient

evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most

favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable

inferences in the light most favorable to the non-moving party. <u>Big Apple BMW,</u>

<u>Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where

the non-moving party's evidence contradicts the movant's, then the non-movant's

must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the

evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see</u>

<u>also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third

Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not
> match, item for item, each piece of evidence proffered by the movant.
> In practical terms, if the opponent has exceeded the "mere scintilla"
> threshold and has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the opponent, even
> if the quantity of the movant's evidence far outweighs that of its
> opponent. It thus remains the province of the fact finder to ascertain the
> believability and weight of the evidence.

<u>Id.</u> In contrast, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita</u>

<u>Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal

quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d

464, 476 (3d Cir. 2011).

B. **This Motion for Summary Judgment Will Be Granted in Part and Denied in Part.**

In her complaint against the remaining defendants, the plaintiff asserts civil rights claims pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws… [to be held] liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983. In bringing this claim, the plaintiff alleges that the defendants have violated her Fourth and Fourteenth Amendment rights.

After a review of the record, we conclude that the plaintiff's Fourteenth Amendment due process claim fails under the more-specific provision rule. In addition, we find that the Fourth Amendment claim relating to the plaintiff's cell phone fails, as the search arguably falls within an exception to the warrant requirement. However, with respect to the Fourth Amendment claim regarding the strip search of Pizarro at the prison, we conclude that there are genuine issues of material fact that preclude summary judgment on this claim. Accordingly, the motion for summary judgment will be granted in part and denied in part.

1. **The More-Specific Provision Rule Precludes the Plaintiff's Due Process Claim.**

In her complaint, Ms. Pizarro asserts that the searches conducted by prison officials deprived her of her right to due process, in addition to violating the Fourth

Amendment. The defendants, in turn, advance the more-specific provision rule as grounds for summary judgment regarding Pizarro's Fourteenth Amendment due process claim. We agree.

The more-specific provision rule states that "if a constitutional claim is covered by a specific constitutional provision… the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)). The Third Circuit has expressly adopted this rule for cases involving Fourteenth Amendment substantive due process claims brought in combination with claims of other constitutional violations that challenge the same conduct. Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 261 (3d Cir. 2010); see also Piazza v. Lakkis, 2012 WL 2007112, at *5-6 (M.D. Pa. June 5, 2012) (Caputo, J.).

In the instant case, Pizarro claims the defendants "[subjected] her to unreasonable search and seizure, unlawful detention, [and] unlawful strip search, thereby depriving [her] of property and liberty without due process of law." (Doc. 17, ¶ 82). In making such a claim, Pizarro effectively challenges Fourth Amendment "unreasonable search and seizure" under the Fourteenth Amendment, while raising an alternative claim invoking the same Fourth Amendment language. (Doc. 17, ¶ 70). The Fourth Amendment's language of "unreasonable search and seizure" more

appropriately encompasses this claim, and we therefore conclude the plaintiff's Fourteenth Amendment due process claim fails under the more-specific provision rule. Thus, this Fourteenth Amendment claim will be dismissed.

**2.  <u>The Special Needs Doctrine Applies to the Phone Search.</u>**

Next, the defendants argue that the special needs doctrine justified their warrantless search of Pizarro's cell phone. We observe that "typically, in order to be 'reasonable' under the Fourth Amendment, a search must be supported by a warrant, unless the search is supportable under one or more of the 'specifically established and well-delineated exceptions' to the warrant requirement." <u>Neumeyer v. Beard</u>, 421 F.3d 210, 213 (3d Cir. 2005) (quoting <u>United States v. Brightwell</u>, 563 F.2d 569, 574 (3d Cir. 1977)). The special needs doctrine effectively falls into the category of "specifically established and well-delineated exceptions." The doctrine functions such that:

> "Where a Fourth Amendment intrusion serves *special government needs*, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." In other words, there are instances when a search furthers a "special governmental need" beyond that of normal law enforcement such that the search, although not supported by the typical quantum of individualized suspicion, can nonetheless still be found constitutionally "reasonable."

11

Neumeyer v. Beard, 421 F.3d 210, 213-14 (3d Cir. 2005) (quoting Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-66 (1989)). Proof of probable cause or reasonable suspicion is unnecessary to invoke the special needs doctrine. Id. at 214. Rather, the government must prove "reasonableness" by means of "a particular search… 'judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests' beyond that of typical law enforcement." Id. (quoting Wilcher v. City of Wilmington, 139 F.3d 366, 373-74 (3d Cir. 1998)).

In determining that a search of a prison visitor's care or cell phone may fall under the special needs doctrine, we note that,

> The problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Bell v. Wolfish, 441 U.S. 520, 547 (1979). Furthermore, the Third Circuit has reasoned that, "considering the relatively minor inconvenience of the searches, balanced against the SCIH/DOC officials' special need to maintain the security and safety of the prison that rises beyond their general need to enforce the law," searches of prison visitors' vehicles are valid under the special needs doctrine. Neumeyer, 421 F.3d at 214.

We conclude that the cell phone search in this case presents sufficiently similar circumstances to the Neumeyer search and therefore falls under the special needs doctrine. Indeed, we have previously held that a search of a cell phone believed to have information that could compromise prison security is "reasonable to ensure that there [is] no information on the cell phone that could compromise the prison or its staff." Randolph v. FCI Allenwood (Med), 2018 WL 2276246, at *6 (M.D. Pa. April 24, 2018), report and recommendation adopted 2018 WL 2263733 (M.D. Pa. May 17, 2018). In instant case, the search of the plaintiff's phone presents no circumstances suggesting an inconvenience beyond a "brief detention." The phone search was a minimally intrusive method of attempting to corroborate the defendants' apparent belief that previous messages indicated Pizarro was attempting to bring contraband into the prison. Although the search recovered no such messages, given the existing case law which permitted such searches, we cannot conclude that this brief and minimally invasive search violated any clearly established rights of the plaintiff under the Fourth Amendment.[2] Accordingly, we will grant summary judgment as to this Fourth Amendment claim.

---

[2] Although we have found that this cell phone search did not violate the Fourth Amendment, given the existing caselaw on the issue, we also find that the defendants would be entitled to qualified immunity on this claim.

**3.** <u>**Defendants are Not Entitled to Qualified Immunity on the Remaining Fourth Amendment Claim.**</u>

We now turn to what is the most troubling aspect of this episode, the strip search of Ms. Pizarro. At the outset, we note that there is little doubt that this strip search violated prison policy which strictly prohibits strip searches of visitors. (<u>See</u> Doc. 45, at 80; <u>see also</u> DC-ADM 812, Section 3B1(b)(6) (updated Feb. 20, 2020). While this fact is not conclusive with regard to the constitutional questions before us, it is instructive regarding the extent to which the conduct undertaken here was a forbidden practice under agency procedures.

Notwithstanding this policy prohibition on visitor strip searches, the defendants argue that the strip search should be upheld on the grounds of reasonable suspicion. Furthermore, the defendants claim that summary judgment should be granted on the grounds of qualified immunity. We disagree, as we conclude that there is a factual dispute as to whether the defendants had reasonable suspicion to justify the strip search, and thus summary judgment would be inappropriate at this time.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly

established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Lower courts have the discretion to decide which question to analyze first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Supreme Court has cautioned courts to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." Id. (internal quotations omitted); see also al-Kidd, 563 U.S. at 735.

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.' " al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has stated that this standard does not require a case directly on point but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Taylor v. Barkes, 575 U.S. 822 (2015).

The dispositive question that the court must ask is "whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al-Kidd, 563 U.S. at 742). The inquiry "must be undertaken in light

of the specific context of the case, not as a broad general proposition." Id.; see also Davenport v. Borough of Homestead, 870 F.3d 273, 281 (3d Cir. 2017). This "clearly established" standard ensures that an official can reasonably anticipate when his or her conduct may give rise to liability, and "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties." Reichle, 566 U.S. at 664.

We find that there is a genuine issue of material fact concerning whether this particular strip search violated the plaintiff's Fourth Amendment rights. As we have noted, for a warrantless search to be valid under the Fourth Amendment, the officers conducting the search must have reasonable suspicion of criminal activity. United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018). It is well settled that "reasonable suspicion 'requires only a particularized and objective basis for suspecting . . . criminal activity.'" Id. (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Moreover, whether an officer has reasonable suspicion must be evaluated in light of the totality of the circumstances. Id. However, reasonable suspicion should not be concluded "based on nothing more substantial than inarticulate hunches." Terry v. Ohio, 392 U.S. 1, 22 (1968); see Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). In essence, the inquiry that reasonable suspicion poses is whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable

caution in the belief' that the action taken was appropriate." <u>Terry</u>, 392 U.S. at 21-22.

In the instant case, we cannot conclusively answer this inquiry in the affirmative as a matter of law. We cannot do so in large measure because the defendants themselves could not fully articulate specific facts giving rise to a reasonable suspicion to conduct a strip search in this case. While the plaintiff's alleged text messages and money transfers may have authorized the defendants' initial detention and questioning, there is no evidence indicating Pizarro's answers allowed the defendants to reasonably conclude a strip search was appropriate. Quite the contrary, when deposed, Defendant Bradley admitted that, following the initial interview, he "was on the fence. [He] wasn't sure if [Pizarro] had narcotics on her or not." (Doc. 44-2, at 6). In our view, this averment—which is cloaked in uncertainty regarding whether Ms. Pizarro possessed contraband—falls short of what the Constitution requires in this setting to establish a reasonable suspicion based upon specific and articulable facts.

For his part, Defendant Gardzalla stated that he was not aware of the questions Bradley was asking Pizarro, and that Pizarro offered to be strip searched so that she could visit her boyfriend. (Doc. 45, at 24, 27). Accordingly to Gardzalla, Bradley ordered the search "*presumably* because there was a chance that she had an illicit item on her." (<u>Id.</u>, at 24) (emphasis added). Thus, Gardzalla seemed to justify this

strip search based upon a presumption that there was a chance that Ms. Pizarro possessed contraband. Such speculative presumptions may come perilously close to the type of hunches which, as a matter of settled constitutional law, do not constitute a reasonable suspicion. Further, and significantly, Pizarro stated that prior to their questioning and the strip search, she was subjected to an ion scan, which is used to detect illicit substances on a visitor's person and which she had been through on all of her prior visits as a part of the visitor protocol. (Doc. 44-4, at 7, 10). There is no indication that the ion scan revealed anything suspicious. Therefore, to the extent that the defendants were acting upon some incompletely formed suspicion concerning Ms. Pizarro, the apparent lack of any ion scan evidence to support that suspicion would seem to further undermine the reasonableness of this suspicion. Thus, based on the record before us, we cannot conclude as a matter of law that the defendants had a reasonable suspicion to strip search Pizarro.

Further, we conclude that Pizarro's right to be free from a strip search absent reasonable suspicion was clearly established at the time of the alleged violation. To find that a right has been clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal quotation marks omitted). The Third Circuit has clarified that a right can be clearly established if there is sufficient precedent to

18

constitute notice to the officer that their actions would result in a constitutional violation. Mammaro v. N.J. Div. of Child Prot. & Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (quoting McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001)). On this score,

> We look first for applicable Supreme Court precedent. Even if none exists, it may be possible that a "robust consensus of cases of persuasive authority" in the Court of Appeals could clearly establish a right for purposes of qualified immunity.

Id. (citing Taylor v. Barkes, 575 U.S. 822, 826 (2015)).

In the instant case, we find such a consensus of persuasive authority. This court has acknowledged that "prison visitors may be subject to far more invasive searches of their persons, including strip searches, *where prison officials have reasonable suspicion* that the individual may be carrying contraband." Randolph, 2018 WL 2276243, at *6  (emphasis added) (citing Spear v. Sowders, 71 F.3d 626 (6th Cir. 1995); Romo v. Champion, 46 F.3d 1013 (10th Cir. 1995); Blackburn v. Snow, 771 F.2d 556 (1st Cir. 1985) (all requiring reasonable suspicion for strip searches)); see also Neumeyer, 421 F.3d at 213 n.2 (citing Thorne v. Jones, 765 F.2d 1270, 1277 (5th Cir.1985), and Hunter v. Auger, 672 F.2d 668, 674 (8th Cir. 1982)). Furthermore, another district court in this Circuit has noted that "nine of the ten Circuit Courts that have encountered the issue [of strip searches] have held that prison officials must possess reasonable individualized suspicion before strip

searching prison visitors." <u>Brewer v. Hayman</u>, 2009 U.S. Dist. LEXIS 59321, at *9-11 (D.N.J. July 9, 2009) (collecting cases).[3]

Accordingly, we find that there is a "robust consensus of persuasive authority" that concludes prison officials need, at a minimum, reasonable suspicion to order a strip search of a prison visitor. Thus, these correctional officials were on notice that ordering a strip search of Pizarro without reasonable suspicion violated her Fourth Amendment rights. Given that we have concluded there is a question of fact concerning whether these officials had the requisite reasonable suspicion to order the strip search, we find that summary judgment on the grounds of qualified immunity would be inappropriate.

Further, although we find that a requirement of reasonable suspicion is clearly established in this case, we also note that there is recent caselaw which suggests that prison officials may need more than just a reasonable suspicion to order such a search. In doing so, we turn to a Ninth Circuit case bearing a striking resemblance to the case at hand. In <u>Cates v. Stroud</u>, 976 F.3d 972 (9th Cir. 2020), a female individual was visiting an inmate at a prison in Nevada. Upon attempting to visit her

---

[3] <u>Spear v. Sowders</u>, 71 F.3d 626, 630 (6th Cir. 1995); <u>Romo v. Champion</u>, 46 F.3d 1013, 1020 (10th Cir. 1995); <u>Weber v. Dell</u>, 804 F.2d 796, 802, 804 (2d Cir. 1986); <u>Blackburn v. Snow</u>, 771 F.2d 556, 567 (1st Cir. 1985); <u>Thorne v. Jones</u>, 765 F.2d 1270, 1276 (5th Cir. 1985); <u>Giles v. Ackerman</u>, 746 F.2d 614, 615 (9th Cir. 1984); <u>Mary Beth G. v. City of Chicago</u>, 723 F.2d 1263, 1273 (7th Cir. 1983); <u>Hunter v. Auger</u>, 672 F.2d 668 (8th Cir. 1982); <u>Logan v. Shealy</u>, 660 F.2d 1007, 1013 (4th Cir. 1981).

boyfriend, the plaintiff, who officers suspected of smuggling drugs into the prison, was subjected to a warrantless visual body cavity search. Cates, 976 F.3d at 975-77. At no point did officers inform the plaintiff that she was free to leave. Id. at 976. The Court of Appeals, in holding that the search violated the plaintiff's Fourth Amendment rights, stated that:

> Even if there was reasonable suspicion that [the plaintiff] was seeking to bring drugs into the prison (a question we do not reach), [the defendant] violated her rights under the Fourth Amendment by subjecting her to a strip search without giving her the option of leaving the prison rather than being subjected to the search.

Id. at 984 (adopting the ruling of Spear v. Sowders, 71 F.3d 626 (6th Cir. 1995)).

In this case, Pizarro similarly alleges that "at no point [following her entry into the interview room] did [she] feel free to leave the facility, refuse to answer any questions, [or] refuse to comply with any demands… for fear of being arrested." (Doc. 17, ¶ 21). Thus, while we find that a minimum requirement of reasonable suspicion has been clearly established for strip searches, we note that such a requirement may remain inadequate in cases where prison visitors do not feel free to leave during the search.

In any event, a robust consensus of persuasive authority holds that at a minimum, prison officials need reasonable suspicion to order a strip search of a visitor. Moreover, there is a genuine issue of fact concerning whether the defendants had the requisite reasonable suspicion in this case. Accordingly, we conclude that

the defendants are not entitled to qualified immunity, and summary judgment will be denied with respect to the plaintiff's Fourth Amendment claim concerning the strip search.

### 4. **Sovereign Immunity**

Finally, the defendants contend that to the extent the plaintiff's complaint attempts to set forth state law claims against them, these claims are barred by the doctrine of sovereign immunity. We agree.

Under Pennsylvania law, the Commonwealth, its agencies and employees enjoy broad immunity from most state-law tort claims, as the General Assembly has by statute provided that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. § 2310; see also Moore v. Commonwealth, 538 A.2d 111, 115 (Pa. Commw. Ct. 1988) ("In other words, if the Commonwealth is entitled to sovereign immunity under Act 152, then its officials and employees acting within the scope of their duties are likewise immune"). This grant of immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" Larsen v. State Employees' Ret. Sys., 553 F.Supp.2d 403, 420 (M.D. Pa. 2008). Conduct of an employee is within the scope of employment if "'it is of a kind

and nature that the employee is employed to perform; [and] it occurs substantially within the authorized time and space limits....'" Brautigan v. Fraley, 684 F.Supp. 2d 589, 593-94 (M.D. Pa. 2010); see also Faust v. Dep't of Revenue, 592 A.2d 835 (1991) (holding that a Commonwealth employee was protected under sovereign immunity from liability from intentional acts which caused emotional distress when he was acting within the scope of his duties).

Thus, so long as the agent or employee is acting within the scope of his employment, and none of the nine recognized statutory exceptions apply,[4] sovereign immunity will bar any state law claims against him.

In analyzing claims of sovereign immunity, "Pennsylvania has accepted the Restatement (Second) of Agency's definition of conduct 'within the scope of employment.'" Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000). The Restatement reads, in relevant part:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;

---

[4] In 42 Pa. Cons. Stat. § 8522(b), the General Assembly defined nine separate, narrow exceptions to the broad grant of sovereign immunity. These exceptions include: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. "Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed." Lockwood v. City of Pittsburgh, 561 Pa. 515, 751 A.2d 1136, 1139 (Pa. 2000) (citation omitted).

(b)  it occurs substantially within the authorized time and space limits; [and]

(c)  it is actuated, at least in part, by a purpose to serve the master…

(2)  Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228.

In this case, there is no question that, by subjecting the plaintiff to a strip search, the defendants violated DOC policy that strictly prohibits strip searches of visitors. However, the Third Circuit has noted that "'an act, although forbidden or done in a forbidden manner, may be within the scope of employment.'" Brumfield, 232 F.3d at 381 (quoting Restatement (Second) of Agency § 230). Thus, "under Pennsylvania law, even unauthorized acts may be within the scope of employment 'if they are clearly incidental to the master's business.'" Id. (quoting Shuman Estate v. Weber, 419 A.2d 169 (1980)); see also Lee v. Lamas, 419 F.Supp.3d 863, 870 (E.D. Pa. 2019). This principle has been applied to prison strip search claims and state law tort claims brought against prison officials in this factual context have been dismissed on sovereign immunity grounds. Jackson v. O'Brien, No. 1:18-CV-32, 2020 WL 5702418, at *7 (W.D. Pa. Sept. 24, 2020); Marrow v. Pennsylvania, No. 1:18-CV-00931, 2018 WL 4963982, at *9 (M.D. Pa. Oct. 15, 2018).

On the record before us, we cannot conclude that the defendants' actions fell outside the scope of their employment. To the contrary, the defendants conducted the strip search of Pizarro in order to ensure that she was not smuggling illicit substances into the prison. While violative of the DOC's policy, there is no indication that the defendants' actions were done with any purpose other than the ensure the safety of the institution at SCI Dallas. Accordingly, to the extent the plaintiff's complaint attempts to bring state law claims against these defendants, those claims are barred by the doctrine of sovereign immunity and will be dismissed.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the defendants' motion for summary judgment (Doc. 42) will be GRANTED as to the Fourteenth Amendment claim and Fourth Amendment claim concerning the cell phone search, but DENIED as to the Fourth Amendment strip search claim.

An appropriate order follows.

DATED: October 19, 2021